# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

SOUTHWIRE CO., et al.,
    Plaintiffs,

v.

RAMALLO BROTHERS PRINTING, INC., et al.,
    Defendants.

Civil No. 03-1100 (GAG)

**OPINION AND ORDER**

Plaintiffs in this matter, Southwire Company, Southwire International Corporation, and Heptagon, Ltd. (collectively "Southwire") commenced this action seeking compensatory damages and injunctive relief against the named defendants, Ramallo Brothers Printing, Inc., *et al.* ("Ramallo"), under Sections 107(a) and 113(f) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601, *et seq.* and under Sections 7002(a)(1)(A) and (B) of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as further amended by the Hazardous and Solid Waste Amendment of 1984 ("RCRA"), 42 U.S.C. §§ 6901, *et seq*. Southwire's action also includes supplemental state law claims under the Puerto Rico Environmental Public Policy Act, as well as a breach of contract and tort claim. Presently before the court is Southwire's motion for partial summary judgment (Docket No. 582) and Ramallo's motion to strike (Docket No. 595). Both of these motions have been thoroughly and excellently briefed by both parties (See Docket Nos. 596, 635, 647, 641, 652, 660, 664.) After reviewing the pleadings and pertinent law, the court **DENIES** Ramallo's motion to strike (Docket No. 595), **DENIES** Southwire's motion for partial summary judgment (Docket No. 582), and also **DENIES** Ramallo's cross-motion for summary judgment (Docket No. 596).

**Civil No. 03-1100 (GAG)** 2

## I. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (citations omitted). The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. "The movant must aver an absence of evidence to support the nonmoving party's case. The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party (here, the plaintiff) and give that party the benefit of any and all reasonable inferences. Id. at 255. Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

## II. Relevant Factual & Procedural Background

Southwire owns property located in Canovanas, Puerto Rico (the "Site"). Southwire leased

**Civil No. 03-1100 (GAG)**                                    3

the Site to Ramallo between the years of 1985 and 1999. Ramallo used the Site to store printing related equipment as well as racing boats. Throughout the life of the lease, a Ramallo employee, Luis Concepcion ("Concepcion"), lived at the Site and controlled access in and out. Ramallo, through its Chariman of the Board, gave Concepcion instructions regarding the waste disposal activities at the Site. Ramallo also instructed its drivers to transport waste generated by Ramallo to the Site.

In April 1994, the Puerto Rico Environmental Quality Board ("EQB") began an enforcement action against Ramallo. During an inspection of the Site, EQB personnel found burning containers with paint and other chemicals inside a trench. Strong odors were also detected in the surrounding areas. The EQB determined that the Site was being used as a "clandestine landfill" and issued an administrative order, requiring the discontinuance of use of the Site for waste disposal purposes. In June 1994, Ramallo and the EQB entered into an agreement, which required that Ramallo formulate a clean-up plan and submit it to the EQB. In November 1994, the Site was reinspected and the EQB concluded that Ramallo had failed to comply with the terms of the stipulation and therefore had legal grounds to re-open the administrate enforcement action against Ramallo.

In November 1998, in connection with the potential sale of the property, Southwire initiated an inspection of the Site and found abandoned drums, stained rags, containers of Ramallo products, stained soil, trash, and other materials consisting of ink waste. The drums were labeled "Blue Ink" and "Yellow Ink." Southwire's investigation revealed that soil and groundwater at the Site was contaminated with solvents and heavy metals, and that the contaminants found at the Site were "hazardous substances" within the meaning of CERCLA.

Following its investigation, Southwire informed the U.S. Environmental Protection Agency ("EPA") of the situation. The EPA conducted a site visit in 2000 and further investigated the situation. The EPA determined that there was an actual or threatened release of hazardous substances that presented an imminent and substantial endangerment to public health and the environment.

**Civil No. 03-1100 (GAG)**                                    4

In September 2000, the EPA advised Ramallo that it had reason to believe that Ramallo had operated the Site at the time hazardous substances were disposed at the Site. The EPA asked for Ramallo's cooperation in the removal activities and the investigation into the Site conditions. Ramallo responded to the EPA in June 2001, claiming that it was not aware of the disposal at the Site of any hazardous substances, hazardous wastes or industrial wastes by Ramallo. Ramallo later pled guilty under the False Statements Statute for providing untruthful information to the EPA during the investigation of the Site's conditions. Ramallo entered into a plea agreement (the "Criminal Plea Agreement") with the Environmental Crimes Section of the Department of Justice ("DOJ"). See Crim No. 07-449(JAF) at Docket No. 3.

On December 18, 2001, Southwire and the EPA entered into an Administrative Settlement Agreement and Order on Consent for Removal Action (the "Settlement Agreement"), which required Southwire to fully investigate the buried solid waste to ensure that all drums and waste containers, potentially containing hazardous substances, were located and removed. Southwire contracted Williams Environmental, Inc. ("Williams") to take charge of the removal at the Site under the supervision of the EPA. Following the completion of its work, Williams prepared an Overview of Site Activities Report and a Removal Action Final Report, documenting the removal activities and the findings at the Site. The removal activities resulted in the excavation and removal of ink-stained rags, rolls of printed labels, dried ink, and 477 buried drums. CERCLA hazardous substances were identified in the wastes found on the Site. Among the waste containing hazardous substances were copper plating solution and long oil alkyd, both of which were used by Ramallo in its business. The contents of the drums were determined to contain hazardous waste under RCRA and CERCLA. Southwire was forced to pay for the removal actions undertaken in the Settlement Agreement.

A complaint was filed on January 31, 2003. On March 31, 2006, Southwire filed a third amended complaint (Docket No. 134). On July 5, 2006, Ramallo filed a motion to dismiss this complaint (Docket No. 160). The court issued an opinion and order (Docket No. 220) on December

**Civil No. 03-1100 (GAG)**                          5

22, 2006 denying Ramallo's motion to dismiss.[1] On September 23, 2007, Ramallo filed a motion for partial summary judgment (Docket No. 363), requesting the dismissal of all CERCLA claims. In its motion, Ramallo argued that the DOJ's determination that "the materials found at Southwire's property were industrial waste and not hazardous waste under federal law" precluded Southwire from stating a valid claim under CERCLA. (See Docket No. 363-2 at 7.) On March 11, 2008, the court modified and adopted Magistrate Judge Camille Velez-Rive's report and recommendation denying summary judgment (Docket No. 429), holding that "[n]one of the statements in the Criminal Plea Agreement [entered into between Ramallo and the DOJ] preclude the possibility that hazardous substances were found at the Site. The Criminal Plea Agreement relies upon only initial Site investigations and does not reflect the findings of subsequent investigations." (See Docket No. 461 at 5.) On December 1, 2009, Southwire filed the instant motion for partial summary judgment (Docket No. 582), which was opposed by Ramallo on January 23, 2010 (Docket No. 596).[2] On January 22, 2010, Ramallo moved to strike certain evidence presented with Southwire's motion for partial summary judgment (Docket No. 595).

**III.   Discussion**

   **A.   Ramallo's Motion to Strike**

Ramallo moved to strike Williams' Overview of Site Activities Report (Docket No. 522-46) and the Removal Action Final Report (Docket No. 522-25) (the "Reports") arguing that these documents, as well as Southwire's undisputed facts premised upon them ( Docket No. 582-2 at ¶¶ 24, 33, 24, 35), should not be considered by the court. Ramallo contends that this evidence must be

---

[1] Ramallo moved to dismiss Southwire's RCRA claims on the grounds that Southwire had "finished the work required under the [Settlement Agreement]" and therefore there was no present right to claim the injunctive relief provided by RCRA. In its opinion and order (Docket No. 220), the court ruled against Ramallo's contention that this constituted grounds for the dismissal of the RCRA claim. (See Docket No. 220 at 2.)

[2] Ramallo's opposition included a cross motion for summary judgment.

**Civil No. 03-1100 (GAG)**                                      6

stricken as a result of Southwire's spoliation of relevant evidence and serious discovery misconduct. The Reports contain summaries of laboratory tests done on seven (7) industrial drums found at the Site. The Reports conclude that the 7 drums analyzed contained hazardous substances within the meaning of CERCLA. Ramallo contends that, Southwire's failure to notify of its plans to dispose of the drums and samples precludes the court from considering this evidence, as Ramallo was not given an opportunity to conduct its own study. Ramallo further contends that Southwire has withheld the production of Williams' supporting data and documents that provide the factual underpinnings to the Reports.

Spoliation can be defined as the failure to preserve evidence that is relevant to pending or potential litigation." Jimenez-Sanchez v. Caribbean Restaurants, JJC, 483 F. Supp. 2d 140, 143 (D.P.R. 2007). "Sanctions for spoliation range from dismissal of the action, exclusion of evidence or testimony or instructing the jury on a negative inference to spoliation whereby jury may infer that party that destroyed evidence did so out of realization that it was unfavorable." Perez v. Hyundai Motor Co., 440 F. Supp. 2d 57, 62 (D.P.R. 2006) (citing Driggin v. Am. Sec. Alarm. Co., 141 F. Supp. 2d 113, 120 (D. Me. 2000)). "The measure of the appropriate sanctions will depend on the severity of the prejudice suffered." Perez, 440 F. Supp. 2d at 61. Another consideration is "whether the non-offending party bears any responsibility for the prejudice from which he suffers." Id. (citing Driggin, 141 F. Supp. 2d at 121).

To support its prayer for sanctions, Ramallo cites to the court's reasoning in In Re Tutu Wells Contamination Litigation, 162 F.R.D. 46 (D. Virgin Islands 1995). In Tutu Wells, the plaintiffs brought CERCLA contribution claims against various defendants for alleged contamination of water wells. See 162 F.R.D. 46. The court imposed severe sanctions against the Esso defendants holding that "[r]espondents' campaign in this litigation was one of misdirection, delay, oppressive pleadings, expense and harassment." See id. at 71. The court cited numerous occasions where the Esso defendants engaged in dilatory tactics "calculated to frustrate and exhaust the opposition." Id. at 70-71, 74-75, 78-79. The court finds that the facts of this case are distinguishable from those of In Re Tutu Wells. It is undisputed that Southwire disposed of the 7

**Civil No. 03-1100 (GAG)**                    7

drums in accordance with its agreement to clean up the Site. As such, the evidence sought by Ramallo was no longer in Southwire's possession at the time it was requested. Furthermore, Southwire has provided all of the raw data used to support the conclusions found in the Reports. Therefore, unlike the Esso defendants in Tutu Wells, Southwire has complied with discovery requests by producing all existing data related to the analysis of the tested drums.[3]

In considering the arguments made by both parties, the court recognizes multiple factors which militate against granting Ramallo's requested sanctions. For one, the evidence was disposed of at least five years prior to Ramallo's request to analyze the samples. Thus, considering that the drums allegedly contained hazardous materials, Southwire's disposal of the same was not unreasonable. Secondly, Ramallo has been provided with access to all of the raw data associated with the drums since 2005. This data was once again reproduced to Ramallo when Southwire provided Ramallo with copies of the Reports. Finally, in 2008, Southwire produced additional analytical data that it received from Williams. Thus, Ramallo possesses the raw data necessary to contradict the findings in the Reports, thereby limiting the prejudice resulting from Soutwire's actions. In addition, this testing was conducted by a neutral third party (Williams) in accordance with the testing methods and protocols of the EPA; thus, the court considers the data collected to be highly reliable. Finally, unlike the circumstances at play in Tutu Mills, there is no evidence indicating that Southwire acted in bad faith in making its decision to dispose of the drums, as it has subsequently complied with all other discovery requests related to the testing. Accordingly, the court **DENIES** Ramallo's motion to strike this evidence (Docket No. 595) and will consider said evidence when ruling on the parties' cross motions for summary judgment.

---

[3] In its reply brief, Ramallo further contends that the facts are similar to Tutu Wells because Southwire waited three years before producing the Reports to Ramallo. (See Docket No. 647 at 14.) However, the court finds that Ramallo's assertions are not supported by the record as it clearly indicates that both Reports were made available to Ramallo since at least 2005, as they were the subject of questions asked during the taking of Southwire's corporate deposition on October 19, 2005. (See Docket No. 660-4 at 4.)

**Civil No. 03-1100 (GAG)**                              8

### B.     Southwire's Motion for Partial Summary Judgment

Southwire moves for partial summary judgment on the issue of Ramallo's liability as an operator under Section 107(a) of CERCLA. CERCLA imposes strict liability on a defendant when a plaintiff is able to establish the following elements: (1) the defendant falls within one of the four classes of "covered persons" defined in CERCLA section 107(a); (2) there has been a "release or threatened release" of a "hazardous substance" from a facility; (3) the release or threatened release has caused the plaintiff to incur response costs; and (4) plaintiff's costs are necessary costs contingent with the national contingency plan. See United States v. Davis, 261 F.3d 1, 29 (1st Cir. 2001) (citing 42 U.S.C. § 9607).

The evidence on the record clearly establishes the second and third prongs of strict liability under CERCLA. The EPA has determined that there has been a release of a hazardous substance from the Site. (See Docket No. 522-53 at 5, ¶ 26.) Furthermore, Southwire has incurred costs as a result of the EPA's determination and subsequent mandated cleanup costs. (See Docket No. 522-53.) Neither of these facts are contested by Ramallo. As to the fourth prong, the First Circuit has held that a determination under the national contingency plan is a matter of amount for proof of damages and not necessary for the determination of CERCLA liability. See Reardon v. United States, 947 F.2d 1509, 1519 (1st Cir. 1991) ("Whether the response costs were incurred consistently with the national contingency plan is an issue which may be highly factual, but it is usually a matter of the amount, and not the existence, of liability."); see also City of Bangor v. Citizens Commc'ns Co., 532 F.3d 70, 91 (1st Cir. 2008) ("Actions undertaken by the federal or a state government are presumed not to be inconsistent with the NCP."). Therefore, the only contested issue regarding Ramallo's CERCLA liability is whether or not it is considered an "operator" under Section 107(a).

Section 107(a) imposes liability on "any person *who at the time of disposal of any hazardous substance* owned or operated any facility at which such hazardous substances were disposed." 42 U.S.C. § 9607(a)(2) (emphasis added); see also United States v. JG-24, Inc., 331 F. Supp. 2d 14, 62 (D.P.R. 2004). "'An operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or

**Civil No. 03-1100 (GAG)** 9

decisions about compliance with environmental regulations.'" American Cyanamid Co. v. Capuano, 381 F.3d 6, 23 (1st Cir. 2004) (quoting United States v. Bestfoods, 524 U.S. 51, 56 (1998)). Southwire asseverates that Ramallo is liable as an operator "because it controlled the flow and disposal of wastes at the Site, including the flow and disposal of hazardous substances, through its drivers, the custodian of the Site, and its supervisors and executives." (See Docket No. 582 at 10.) Ramallo does not contest the fact that it disposed of industrial waste at the Site during the relevant period. (See Docket No. 597 at ¶¶ 4 & 9.) However, it does contend that Southwire is unable to submit evidence which demonstrates, as a matter of law, that CERCLA hazardous waste[4] was deposited during Ramallo's operation of the Site. (See Docket No. 652 at 4.)

To grant Southwire's motion, it would need to be undisputed that hazardous substances were being deposited *during* the period when Ramallo operated the Site. Southwire alleges that Ramallo is liable as an operator, as it deposited hazardous substances at the Site during the relevant period. However, the court finds that this conclusion is not necessarily demonstrated by the record. The

---

[4] The term "hazardous substance" is defined as:

(A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(14).

**Civil No. 03-1100 (GAG)**                                    10

undisputed facts are as follows: (1) Ramallo operated and dumped industrial waste at the Site between 1985-1999.[5] (See Docket No. 597 at 6, ¶ 9. ) (2) Ramallo utilized materials which contain hazardous substances in its production of products. (See Docket Nos. 582-24 & 582-25.) (3) The EPA has determined that there has been a release of a hazardous substance from the Site. (See Docket No. 522-53 at 5, ¶ 26.) This evidence is insufficient to hold Ramallo liable under CERCLA as a matter of law. See New Jersey Turnpike Auth. v. PPG Industries, Inc., 16 F. Supp. 2d 460, 469 (D.N.J. 1998). ("While it is not necessary for [the plaintiff] to link trace the cause of the response costs to each Generator Defendant, it is not enough that it simply prove that each Generator Defendant produced [hazardous waste] and that [hazardous waste] was found at each of the sites in question . . . . [I]n order to prevail, it must prove that each Generator Defendant deposited (or caused to be deposited) [hazardous waste] at . . . the site[] in question."); see also Dana Corp. v. American Standard, Inc., 866 F. Supp. 1481, 1505 (N.D. Ind. 1994) (requiring plaintiffs to present evidence that defendant's "waste that was hauled to the Site . . . actually contained hazardous substances."); City of New York v. Exxon Corp., 744 F. Supp. 474, 483 (S.D.N.Y.1990) ("liability under CERCLA attaches regardless of the concentration of the hazardous substances present in a defendant's waste so long as the defendant's waste and/or the contaminants in it are 'listed hazardous substances'. . . ."). In support of its argument that it did not deposit hazardous substances during its operation of the Site, Ramallo highlights that its waste was determined to be non-hazardous under RCRA by

---

[5] In its opposition, co-defendant Ramallo Brothers. Printing, Inc. ("Ramallo Bros.") attempts to distance itself from liability for the illegal dumping, which it now attributes solely to Estaban Ramallo-Gonzalez in his personal capacity. However, in considering this motion, the court adopts Ramallo Bros. previous representations to this court. The defendants' Statement of Uncontested Material Facts (Docket No. 363-3) states that "[d]efendants leased the Site from Southwire and/or operated the Site from, approximately 1985 to 1999." (See id. at ¶ 2.) The term "defendants" was defined as all co-defendants named in the third amended complaint, including Ramallo Bros. (See id. at 1.) Furthermore, co-defendant Ramallo Bros. also represented to the EQB, during the 1994 enforcement action, and to the DOJ, through the Criminal Plea Agreement, that it operated the Site from 1985 until 1999. These factual assertions were adopted by the court at Docket Nos. 429 and 461. Therefore, the court will not now consider Ramallo Bros.'s argument that it was not an operator of the Site during the relevant period.

**Civil No. 03-1100 (GAG)**          11

Safety Kleen Envirosystems of Puerto Rico, Inc, ("Safety Kleen"). On January 22, 1998, Safety Kleen sampled, analyzed and performed characterization tests of the waste generated by Ramallo. Saftey Kleen found that the waste did not contain methylene chloride (one of the hazardous substances identified at the Site by the EPA). (See Docket No. 666-1.) Safety Kleen also found that the lead level was negligible, and therefore Ramallo's waste could be disposed of as non-hazardous waste. (See id.) Furthermore, in 1994, in conjunction with a mandated clean up, the EQB ordered an analysis of the inks deposited by Ramallo at the Site. The stipulation order entered into by Ramallo and the EQB on June 13, 1994, stated that the waste material found at the Site was non-hazardous. (See Docket No. 522-47 at 3.) Ramallo also highlights its September 20, 2007 Criminal Plea Agreement with the DOJ, which states that "[t]hese materials were industrial waste and not hazardous waste under federal law."[6]  (See Docket No. 522-5 at 6.)

Southwire opposes these submissions by echoing the court's previous holding that the Criminal Plea Agreement "does not necessarily exclude the issues now raised in this civil lawsuit." (See Docket No. 461 at 4.) In denying Ramallo's previous summary judgment motion (Docket No. 363), the court explained that "[n]one of the statements in the Criminal Plea Agreement preclude the possibility that hazardous substances were found at the Site. The Criminal Plea Agreement relies only upon initial Site investigations and does not reflect the findings of subsequent investigations." (See Docket No. 461 at 5.) Although the court found that the agreement does not necessarily demonstrate that Ramallo's deposited waste did not contain hazardous substances, it also does not militate the opposite conclusion – that it did. Therefore, this court's prior rulings are insufficient for this court to hold, as a matter of law, that Ramallo is an "operator" under CERCLA.

Southwire also presents deposition testimony and affidavits from drivers, former warehouse and shipping supervisors and other witnesses confirming that during the 1980's and 1990's the

---

[6] Ramallo also submitted a memo from Williams summarizing a report by Dr. John Drexler of the Laboratory for Environmental and Geological Studies at the University of Colorado (Docket No. 579-38). The contents of the memo was based on conversations between Williams and Dr. Drexler regarding the results of his testing and the likely source of lead contamination at the Site.

**Civil No. 03-1100 (GAG)**                                    12

wastes generated by Ramallo were regularly transported to the Site for disposal. (See Docket Nos. 522-6 at 4, 10-15; 522-7 at 1-4; 522-11 at 15-16; 522-14 at 5-6; 522-13 at 2-3.) When considered in conjunction with the previously identified undisputed facts, this evidence establishes a genuine issue of material fact regarding Ramallo's alleged role in the disposal of CERCLA hazardous waste at the Site during its operation of the same. Therefore, the court **DENIES** Southwire's motion for partial summary judgment on the issue of Ramallo's operator liability under CERCLA.

      **C.**     **Ramallo's Cross Motion for Summary Judgment**

Ramallo also filed a cross motion for summary judgment (Docket No. 596), in which it attempts to escape CERCLA liability by arguing that (1) Ramallo did not have exclusive control over the Site during the life of its lease (See Docket No. 596 at 14); and (2) Southwire was solely responsible for the disposal of hazardous substances at the Site. (See Docket No. 596 at 19-25.) The court finds that, when viewing the aforementioned evidence in the light most favorable to the non-movant (in this case Southwire), a genuine issue of material fact still exists regarding Ramallo's role in the disposal of hazardous substances at the Site. Therefore, neither Southwire's admissions, nor evidence of Ramallo's lack of exclusive control, are sufficient to exempt Ramallo from liability as an "operator" under CERCLA. See Consolidated Edison Co. of New York, Inc. v. UGI Utilities, Inc., 423 F.3d 90, 100 (2d Cir. 2005) (recognizing that the language of Section 107(a) does not "require that the party seeking necessary costs of response be innocent of wrongdoing"). Accordingly, the court **DENIES** Ramallo's cross motion for summary judgment.

Ramallo also moved to dismiss Southwire's RCRA claim. (See Docket No. 596 at 25-26.) RCRA's citizen suit provision provides solely for a "mandatory injunction, ie., one that orders a responsible party to "take action" by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, i.e., one that "restrains" a responsible party from further violating RCRA. Ramallo alleges that, because the EPA determined that the work required pursuant to the Settlement Agreement has been fully carried out there is no ongoing threat of the release of hazardous substances at the Site, and thus no grounds for injunctive relief against future damages incurred by Southwire. (See Docket No. 582-59.)

**Civil No. 03-1100 (GAG)**                                    13

Southwire opposes Ramallo's motion by citing the court's previous opinion and order of December 22, 2006 (Docket No. 220). In its order, the court denied Ramallo's motion to dismiss Southwire's RCRA claim, holding that "the definitions in the statute do not preclude Southwire's claims as addressed in their complaint." (See Docket No. 220 at 2, l. 11-12.) Southwire contends that the court's previous order regarding this issue precludes Ramallo's current efforts to dismiss this claim.

In response, Ramallo posits that, in light of the March 9, 2009 EPA letter (Docket No. 582-59), this issue is once again justiciable. The EPA letter states that the EPA has reviewed the Removal Action Final Report (Docket No. 522-25) and "determined that the work required pursuant to the Order [the Settlement Agreement] has been fully carried out in accordance with its terms." (See Docket No. 582-59.) The letter further states that "[p]ursuant to the terms of the Order, this notification shall not affect any continuing obligations of Respondents, including but not limited to the reimbursement of EPA Response Costs as specified in Paragraph 81 of the Order." (See id.) In support, Southwire highlights the language of the Settlement Agreement, which reads in pertinent part that:

> nothing herein shall prevent EPA . . . from requiring the Respondents [Southwire] in the future to perform additional activities pursuant to CERCLA or any other applicable law. EPA reserves the right to bring an action against Respondent under Section 107 of CERCLA . . . for recovery of any response costs incurred by the United States related to this Settlement Agreement or the Site and not reimbursed by Respondents.

(See Docket No. 582-35 at ¶ 89.) Southwire points to this language to support its argument that its RCRA claim against Ramallo is not precluded by the EPA's determination, as Southwire still may face future expenses and obligations as a result of the contamination of the Site. In light of the terms of the Settlement Agreement, the court finds that future costs associated with the clean up of the Site could potentially affect Southwire's liability. Therefore, the injunctive relief sought under RCRA may still be appropriate in the event that Ramallo is found partially liable for the contamination of

**Civil No. 03-1100 (GAG)**                              14

the Site.  Accordingly, the court **DENIES** Ramallo's motion to dismiss Southwire's RCRA claim.[7]

IV. **Conclusion**

For the foregoing reasons, the court **DENIES** Ramallo's motion to strike (Docket No. 595) as well as its cross-motion for summary judgement (Docket No. 596) and **DENIES** Southwire's motion for partial summary judgment. (Docket No. 582).

**SO ORDERED**

In San Juan, Puerto Rico this 17th day of June, 2011.

*S/Gustavo A. Gelpí*

GUSTAVO A. GELPÍ

United States District Judge

---

[7] Ramallo also moved to dismiss Southwire's state law claims for lack of federal subject matter jurisdiction.  (See Docket No. 596 at 26-28.)  As the court has denied Ramallo's motion to dismiss Southwire's CERCLA and RCRA claims, subject matter jurisdiction persists over the state law claims pursuant to 28 U.S.C. § 1367.  The court therefore **DENIES** Ramallo's motion to dismiss the state law claims.